**PEABODY COAL COMPANY, Petitioner, Cross–Respondent,**

and

**Old Republic Insurance Company, Petitioner,**

v.

**Annabelle SPESE, Widow of John Spese, Respondent, Cross–Petitioner,**

and

**Director, Office of Workers' Compensation Programs, United States Department of Labor, Respondent, Cross–Respondent.**

Nos. 95–1687, 95–1709.

United States Court of Appeals, Seventh Circuit.

Reargued en banc Dec. 18, 1996.

Decided June 27, 1997.

Mark E. Solomons (argued), Laura M. Klaus, Arter & Hadden, Washington, DC, for Peabody Coal Company, Old Republic Insurance Company in No. 95–1687.

Ida Castro, Department of Labor, Appellate Litigation, Washington, DC, Patricia M. Nece, Cheryl Blair–Kijewski, Gary K. Stearman (argued), Department of Labor, Office of the Solicitor, Washington, DC, for Office of Workers' Compensation Programs, United States Department of Labor.

Raymond T. Reott, Michael S. Freeman (argued), Jenner & Block, Chicago, IL, for Annabelle Spese.

Thomas O. Shepherd, Jr., Benefits Review Board, Washington, DC, for Benefits Review Board.

Mark E. Solomons (argued), Laura M. Klaus, Arter & Hadden, Washington, DC, for Peabody Coal Company in No. 95–1709.

Before POSNER, Chief Judge, and CUMMINGS, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION, KANNE, ROVNER, DIANE P. WOOD and EVANS, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Coal miners seeking benefits under the Black Lung Benefits Act, 30 U.S.C. §§ 901–945, often file an initial application that is unsuccessful and then try again some years later. In this case, we consider what evidence a miner must produce to win the right to proceed on his second or subsequent claim. In so doing, we discuss the scope of our decision in *Sahara Coal Co. v. Director, OWCP,* 946 F.2d 554 (7th Cir.1991), which we believe has been misunderstood in some quarters. In addition, we must also decide when a later-filed claim merges with an earlier claim, under 20 C.F.R. § 725.309(c), one of the Director's regulations implementing the Act. The answers to these two questions determine the fate of the application before us, which has been in litigation in one form or another by the miner (and later his widow) for more than twenty years.

## I

Although the background facts were set forth in the panel's opinion, *Peabody Coal Co. v. Spese,* 94 F.3d 369 (7th Cir.1996) *(Spese I),* for the sake of convenience we review the essential points here. John Spese, the miner, had worked as a mechanic repairing and maintaining coal trucks at a surface mine operated by Northern Illinois Coal Company, which Peabody Coal Company later acquired. (For convenience, we refer to his employer as "Peabody" without distinguishing it from its predecessor.) By the time he was laid off in February 1976, as a result of Peabody's decision to close the mine, Mr. Spese had worked for the company for 40 years. Two months after his retirement, Mr. Spese filed his first claim for black lung benefits. As part of his application, he underwent a battery of tests, including a physical examination, a chest x-ray, and a pulmonary function examination.

At that time, the Department of Labor (DOL) evaluated black lung applications under 20 C.F.R. Part 727, which the DOL describes as "claimant favorable." This regulation was issued under the 1977 amendments to the Black Lung Benefits Act (BLBRA), in which Congress allowed the DOL to establish interim criteria for evaluating black lung claims until it was able to issue permanent regulations for those claims. The interim criteria could be no more restrictive than the criteria that had applied to claims filed by June 30, 1973, under earlier legislation administered by the former Department of Health, Education, and Welfare (HEW). See 30 U.S.C. § 902(f)(2); *Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 688, 111 S.Ct. 2524, 2529, 115 L.Ed.2d 604 (1991); *Pittston Coal Group v. Sebben,* 488 U.S. 105, 110, 109 S.Ct. 414, 418, 102 L.Ed.2d 408 (1988). In taking this step, Congress apparently wanted to continue the "prompt and vigorous processing of the large backlog" of black lung claims that the HEW's lenient interim presumptions (as opposed to HEW's more stringent permanent regulations) had been designed to facilitate. See Pittston Coal, 488 U.S. at 116, 109 S.Ct. at 421.

Using the Part 727 interim criteria, DOL denied Mr. Spese's claim on April 30, 1979, explaining that he did not qualify because the evidence in his claim did not show that he had pneumoconiosis. In the denial letter, DOL advised Mr. Spese that he had 60 days to submit additional evidence or to request a hearing on the denied claim, and one year to submit proof that his condition had changed or that a mistake was made in denying his claim. Mr. Spese neither appealed the adverse decision nor asked DOL to reconsider it.

Instead, on December 18, 1981, Mr. Spese filed a second claim for black lung benefits, coupled with a request that his first claim be reopened. DOL refused to reopen the 1976 claim, but it processed his second application. Because the second claim was filed after March 31, 1980, the effective date of DOL's permanent black lung regulations found in 20 C.F.R. Part 718, the claims examiner from DOL's Office of Workers' Compensation Programs, Coal Mine Division, evaluated it under Part 718. The claims examiner denied the second claim on May 6, 1982, because a second round of medical tests, including a second chest x-ray, again showed no signs of pneumoconiosis. This time, Mr. Spese asked for a formal hearing before an Administrative Law Judge, which took place nearly four years later on April 4, 1986. Prior to that

hearing, in 1985, he had undergone a third x-ray. Unlike the earlier two, the 1985 x-ray was read as positive for pneumoconiosis. Confronted for the first time with a positive x-ray, at the hearing Peabody asked the ALJ to keep the record open so that it could submit its own interpretation of the image. In the end, however, it never did so, nor did it offer any other supplemental evidence that might have refuted the 1985 x-ray.

On November 19, 1986, ALJ Richard Huddleston issued a decision ruling in Mr. Spese's favor. The first question he addressed was whether the 1981 claim was a "duplicate" of the 1979 claim, such that the later claim merged into the earlier one under the terms of 20 C.F.R. § 725.309(c). That regulation states, in part:

> A Claimant who filed a claim for benefits under Part B of title IV of the Act or Part C of Title IV of the Act, before March 1, 1978, and whose claim(s) are pending or have been finally denied, who files an additional claim under this part, shall have the later claim merged with any earlier claim subject to review under Part 727 of this subchapter. If an earlier claim subject to review under Part 727 of this subchapter has been denied after review, a new claim under this part shall also be denied, on the grounds of the prior denial unless the Deputy Commissioner determines that there has been a material change in conditions or the later claim is a request for modification and the requirements of § 725.310 are met.

Interpreting the first sentence of the regulation, ALJ Huddleston concluded that Mr. Spese's 1981 claim should be merged into his 1976 claim, because the latter claim, which had been subject to review under Part 727, had been filed before 1978 and it had been "finally denied." The merger meant two important things for Mr. Spese's claim: first, it would entitle him to an earlier date for the beginning of his benefits, and second, it would entitle him to have the entire record reviewed under the more lenient criteria of Part 727. Applying the second sentence of § 725.309(c) quoted above, the ALJ concluded that the 1985 x-ray, along with a pulmonary exam dated February 17, 1982, demonstrated a "material change in conditions" that

justified consideration of the second claim. On the merits, the ALJ awarded Mr. Spese benefits dating back to April 1976, based on the "interim presumption" of 20 C.F.R. § 727.203(a), which presumed that pneumoconiosis was caused by exposure at the mines if the applicant had worked there at least 10 years and medical evidence (like the 1985 x-ray) revealed the disease.

Peabody appealed to the Benefits Review Board (BRB), which agreed with the ALJ's assessment of the "material change in conditions" but which disagreed with his conclusion that Mr. Spese's 1981 claim merged with the earlier one. The BRB interpreted the phrase "claim subject to review under Section 727" in the first sentence of the regulation to allow merger only if the earlier claim was *still* subject to Section 727 review. The BRB therefore sent the case back to the ALJ for reconsideration under the more stringent Section 718 criteria.

On remand, the ALJ again found that Mr. Spese (who had by then passed away and was represented by his widow) was entitled to benefits. His entitlement, in turn, carried over to his wife, who as a surviving spouse is entitled to benefits based on her husband's claim. See 20 C.F.R. § 725.212. To establish eligibility under Part 718, the claimant had to show (1) that he is a miner, (2) that he has pneumoconiosis, (3) that his pneumoconiosis arose at least in part out of coal mine employment, and (4) that he is totally disabled as a result of the pneumoconiosis. The first three of these were easy to show, in the ALJ's view. Mr. Spese had been a miner for 40 years, the 1985 x-ray showed that he had pneumoconiosis, and Peabody had not rebutted the regulatory presumption that Mr. Spese, as a miner with at least 10 years in an environment just as dusty as an underground coal mine, acquired the disease at least in part due to his coal mine employment. See 20 C.F.R. § 718.203(b) (presumption that pneumoconiosis caused by coal mining work).

Even with this presumption, however, a claimant qualifies for benefits only if he can show he is (or was at the time of death) totally disabled as a result of pneumoconiosis. See 20 C.F.R. § 718.204. On that issue, the ALJ found that Mr. Spese was totally

disabled, which 20 C.F.R. § 718.204(b) defines as meaning that the miner cannot perform his usual coal mine work, nor engage in gainful employment in the immediate area of his residence requiring the skills or abilities comparable to those of any employment in the mines in which he previously engaged with some regularity over a substantial period of time. Mr. Spese was not able to show total disability under the criteria of 20 C.F.R. § 718.204(c)(1)-(3) on the basis of the blood gas and pulmonary function studies in the record. However, Dr. Sachdev, who examined Mr. Spese on February 17, 1982, reported that he was limited to walking one block, climbing one flight of stairs, and lifting and carrying no weight—limitations that certainly would have precluded someone from performing the kind of work Mr. Spese had done at the mine. The ALJ found that Dr. Sachdev's diagnosis was a diagnosis of total disability and found under the rebuttable presumption of 20 C.F.R. § 718.305(a) that it was caused by pneumoconiosis. The ALJ relied on 20 C.F.R. § 725.503 to fix the date from which benefits would be paid. Under that regulation, if an exact onset date of total disability cannot be determined, then benefits are payable from the month of the filing of the application for benefits. The ALJ thus found that Mr. Spese's benefits were payable from December 1, 1981.

Peabody again appealed to the BRB, which affirmed the ALJ's decision on January 24, 1995. It appealed to this court from DOL's final decision that Mr. Spese was entitled to Part 718 benefits. Mrs. Spese cross-appealed from the decision to reject merger of the 1981 claim with the 1976 claim. The original panel affirmed the award of Part 718 benefits, but it concluded that the 1981 claim should have been merged with the 1976 claim for purposes of calculating the date on which benefit payments should commence. See *Spese I*, 94 F.3d at 372-73. Upon being told by the Secretary of Labor that the panel's decision to reject his interpretation of the merger rule both conflicted with the Eighth Circuit's decision in *Tonelli v. Director, OWCP*, 878 F.2d 1083 (8th Cir.1989), and risked adding some $1.08 billion in liability to the Black Lung Disability Trust Fund, we decided to rehear the case *en banc*. At oral

argument, it also became clear that clarification of our *Sahara Coal* decision is desirable, as a number of our sister circuits appear to have misunderstood what we require to show a "material change in conditions" for purposes of second or subsequent applications. See *Labelle Processing Co. v. Swarrow*, 72 F.3d 308 (3d Cir.1995); *Lisa Lee Mines v. Director, OWCP*, 86 F.3d 1358 (4th Cir.1996) (en banc), *cert. denied,* — U.S. —, 117 S.Ct. 763, 136 L.Ed.2d 711 (1997); *Sharondale Corp. v. Ross*, 42 F.3d 993 (6th Cir. 1994); *Lovilia Coal Co. v. Harvey*, 109 F.3d 445 (8th Cir.1997). But see *Wyoming Fuel Co. v. Director, OWCP*, 90 F.3d 1502 (10th Cir.1996). We therefore take this opportunity to address *Sahara Coal* as well.

## II

If a later claim merges into an earlier one, then in a real sense it is not a "new" claim at all, but is instead a continuation of the first claim. As the panel opinion here recognized, in those cases where merger is appropriate, "the duplicate claim merges into the first claim and takes on its properties," including, importantly, eligibility for review under Part 727 instead of Part 718. See *Spese I*, 94 F.3d at 372. Logically, then, the first question we must consider is whether Mr. Spese's 1981 claim merged into his 1976 claim. If it did, as the panel held, this may affect whether the "material change in conditions" requirement for new claims applies to it at all. If it did not, then it is clear we must reach the question whether the events here qualified as a "material change in conditions" for purposes of the second sentence of § 725.309(c).

### A. Merger

■ The panel took the view that the language of § 725.309(c) admitted of only one interpretation, which was not the one the Director espoused. As the panel saw it, the first sentence of the regulation effectively read as follows: "[a] claimant who filed a claim for benefits ... before March 1, 1978, and whose claim(s) are pending or have been finally denied, who files an additional claim under this part, shall have the later claim

merged with any earlier claim [*that was ever*] subject to review under Part 727 of this subchapter." Only by inferring that the phrase "subject to review" referred to all Part 727 claims—pending, subject to reconsideration, or terminated—can that phrase have the identical meaning for the first and second sentences of the regulation, since the second sentence uses the term "subject to review" under Part 727 to describe the class of claims in which final denials have occurred. In so doing, the panel followed the maxim of statutory interpretation that words in a statute normally mean the same thing wherever they appear. See *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 567, 115 S.Ct. 1061, 1066, 131 L.Ed.2d 1 (1995); *Sullivan v. Stroop*, 496 U.S. 478, 485, 110 S.Ct. 2499, 2504, 110 L.Ed.2d 438 (1990).

Upon further consideration, we have concluded that this approach failed to take proper account of the context in which the phrase occurs in the two different sentences of the regulation. More importantly, in the face of the statutory language that lies behind this regulation, as well as our responsibility to defer to the Director's interpretations, a court should not resort to that kind of generalized principle of statutory construction to find an inconsistency with the agency's interpretation. Unless the language of the statute clearly required a result in conflict with the Director's view, in which case we would be bound to follow the statute, the question we must ask is whether the Director reasonably could have read the regulation as he did. See *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 476, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992); *Chevron U.S.A., Inc. v. Nat'l Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The Director has consistently taken the position that the regulation should be read as if the first sentence said "... the later claim merged with any earlier claim [*still*] subject to review under Part 727...." He points out that Congress created the distinction between the permanent Part 718 procedures and the interim Part 727 procedures in response to its dissatisfaction with black lung claims processing in general. See *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 687,

111 S.Ct. 2524, 2529, 115 L.Ed.2d 604 (1991). In BLBRA, it instructed the Secretary of Labor to reopen or reexamine all Part C claims pending on March 1, 1978, or denied prior to that date. See 30 U.S.C. § 945. Along with this process, Congress expressly authorized the Secretary to issue the two sets of regulations that became Part 727 (interim) and Part 718 (permanent). See 30 U.S.C. § 902(f)(1), (2). The statute directed that the permanent regulations issued by the Director would apply only to claims that were filed after the effective date of those regulations and that were no longer subject to review under 30 U.S.C. § 945(a) (review by Secretary of Health and Human Services) or 30 U.S.C. § 945(b) (review by Secretary of Labor). *See* 30 U.S.C. § 902(2) (providing that interim criteria shall be no more restrictive than interim HEW criteria). The Director made the permanent criteria applicable to claims filed after March 31, 1980. *See* 20 C.F.R. § 718(2); see also *Pauley*, 501 U.S. at 688, 111 S.Ct. at 2529; *Pittston Coal*, 488 U.S. at 110, 109 S.Ct. at 418 (summarizing history of regulations).

Spese's interpretation of § 725.309(c), which the panel accepted, substantially undermines the Secretary of Labor's authority to promulgate both an interim and permanent regulatory scheme distinct from the earlier HEW scheme. Transferring to the Secretary of Labor the rule-making authority for this transition period was one purpose of the 1977 amendment. As the Supreme Court has pointed out, the amendment would even have permitted the Secretary of Labor to issue *more* liberal criteria than those in effect on June 30, 1973. See *Pittston Coal*, 488 U.S. at 118, 109 S.Ct. at 422. Even if it is true that post-March 31, 1980, claims would not receive Part 727 treatment unless a material change in conditions were proven, see *Spese I*, 94 F.3d at 373 n. 4, Spese's proposed reading would submit claims filed during the transition period to consideration under the earlier HEW criteria, creating an inconsistency with § 902(f)(2)'s direction for that (not inconsiderable) group of cases.

Under the Director's interpretation of § 725.309(c), merger is still possible for some duplicate claims, but it is a much smaller

(and shrinking) class. First, the earlier claim must have been pending or finally denied before March 1, 1978. Pending claims are easy enough to handle; the interpretive problem arises with those that were "finally" denied. For each, the claim must be "subject to review" under Part 727. That means, the Director says, that it is either awaiting review, undergoing review, or (at the most) the one-year period for post-denial reconsideration has not yet run. This interpretation does no violence to the second sentence of § 725.309(c), the Director argues, because in context the phrase "subject to review" must mean only claims that were governed by the Part 727 criteria based on 39 U.S.C. § 945. See 20 C.F.R. §§ 727.401–727.405. The second sentence addresses what happens when such a claim has been finally denied; the first sentence addresses what happens when a new claim is filed while the Part 727 claim is still alive.

We cannot say that under *Chevron,* 467 U.S. at 845, 104 S.Ct. at 2783, the Director's interpretation is unreasonable. See also *Estate of Cowart,* 505 U.S. at 476, 112 S.Ct. at 2594; *Pauley,* 501 U.S. at 699, 111 S.Ct. at 2535 (Secretary of Labor's interpretation entitled to deference unless unreasonable). Indeed, we agree with the Director that his system is more consistent with the general statutory scheme Congress was trying to establish. That means, for Mrs. Spese, that her husband's 1981 claim did not merge with his earlier 1976 claim. The 1976 claim, which had been adjudicated under Part 727, had long since been finally denied, and it was no longer subject to any form of reconsideration under the statute and regulations. See 20 C.F.R. § 727.102(b) (defining "denied" claim). If she is entitled to benefits on his behalf, they must be measured from December 1, 1981, as the BRB found.

### B. Material Change

Our conclusion with respect to merger means that Mr. Spese's 1981 claim was a "new claim" for purposes of the second sentence of § 725.309(c). Under the regulation, this kind of new claim "shall also be denied, on the grounds of the prior denial, unless the deputy commissioner determines that there has been a material change in conditions or the later claim is a request for modification and the requirements of section 725.310 are met." No one is arguing that his 1981 claim was a request for modification meeting the requirements of § 725.310. Peabody argues that under our decision in *Sahara Coal* Mr. Spese did not demonstrate a material change in conditions; Mrs. Spese defends the BRB's conclusion that he did, as does the Director.

■ In *Sahara Coal,* this court drew an important distinction between a second claim that merely attempts to relitigate the first one and a genuine showing of changed conditions. By requiring denial of a second application unless there has been a material change in conditions, the regulation gives res judicata effect to the first decision. See 20 C.F.R. § 725.309(c). The *Sahara Coal* court went on to explain that

[a] material change in conditions means either that the miner did not have black lung disease at the time of the first application but has since contracted it and become totally disabled by it, or that his disease has progressed to the point of becoming totally disabling although it was not at the time of the first application.

946 F.2d at 556.

■ In its recent *en banc* decision in *Lisa Lee Mines, supra,* the Fourth Circuit summarized what it believed to be the three competing ways of satisfying the regulation's requirement to show a "material change in condition": (1) the test initially formulated by the BRB in this very case, see *Spese v. Peabody Coal Co.,* 11 Black Lung Rptr. 1–74, 1–76 (BRB 1978) (per curiam), under which the Director would look to see whether the newly submitted evidence favorable to the claim has a "reasonable possibility" of changing the prior result; (2) the *Sahara Coal* test, which the Fourth Circuit characterized as requiring the miner to show a material change on every element that was previously decided against him; or (3) the Director's new "one-element" standard, under which the claimant's new claim could proceed once he demonstrated a material change in at least one of the elements that was previously adjudicated against him. Virtually every court has rejected the BRB's Spese test,

including this court in *Sahara Coal*, see 946 F.2d at 556; *Lovilia*, 109 F.3d at 451; *Wyoming Fuel*, 90 F.3d at 1508; *Lisa Lee Mines*, 86 F.3d at 1363; *Labelle*, 72 F.3d at 317; *Sharondale*, 42 F.3d at 997–98. As we pointed out in *Sahara Coal*, the BRB's approach made mincemeat of res judicata; new evidence about the claimant's condition at the time of the earlier claim might well have a reasonable possibility of changing the prior result, but it would leave final decisions vulnerable to perpetual challenge. In our view, *Sahara Coal* was correct to require evidence showing that the claimant's physical condition changed materially between the time of the earlier denial and the new application, such that a finding for the miner on the new application would not imply that the earlier denial was erroneous. As the panel noted here, the health of an individual in 1981 does not necessarily implicate the same claim as the health of the same individual in 1976, if a material change has occurred in the ensuing five years. 94 F.3d at 372, citing *Lisa Lee Mines*, 86 F.3d at 1362.

■■■ The law of preclusion also bars relitigation of issues between the same parties when those issues were actually litigated and necessary to the decision of the earlier tribunal. See Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 107, 111 S.Ct. 2166, 2169, 115 L.Ed.2d 96 (1991) (preclusion applies to administrative agency acting in judicial capacity to resolve fact issues properly before it); *United States v. Wyatt*, 102 F.3d 241, 245 n. 5 (7th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1325, 137 L.Ed.2d 486 (1997); *Waid v. Merrill Area Public Schools*, 91 F.3d 857, 866 (7th Cir.1996) (state agency hearing). It is here that *Sahara Coal* has been misunderstood. The Fourth Circuit assumed that this court was insisting that a claimant negate every possible theory that might have motivated a prior negative decision—in effect prove that the first decision was right—before we would find a material change in circumstances. It pointed out, correctly, that a claimant who loses on three possible alternate grounds has no incentive to take an appeal to "correct" the agency on grounds 2 and 3, even if he thinks there was error, if ground 1 is unassailable. Assuming that the passage of time has led to a material

change in ground 1 and he can demonstrate this to the Director, the question is whether he should be barred from proceeding on a new claim just because he has not also developed new evidence to negate grounds 2 and 3. Under the Director's "one-element" approach, as endorsed by the Fourth Circuit and others, see *Lovilia*, 109 F.3d at 454; *Lisa Lee Mines*, 86 F.3d at 1363; *Labelle*, 72 F.3d at 318; *Sharondale*, 42 F.3d at 998, the answer is no. This answer is consistent with general principles of issue preclusion, under which holdings in the alternative, either of which would independently be sufficient to support a result, are not conclusive in subsequent litigation with respect to either issue standing alone. See Lisa Lee Mines, 86 F.3d at 1363, citing Restatement (Second) of Judgments § 27, comment i (1982); *Comair Rotron, Inc. v. Nippon Densan Corp.*, 49 F.3d 1535, 1538 (Fed.Cir.1995) (issue on which preclusion is sought must have clearly been necessary to judgment); *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1475 (8th Cir. 1994); *Gelb v. Royal Globe Insur. Co.*, 798 F.2d 38, 45 n. 6 (2d Cir.1986). But see *Schellong v. United States INS*, 805 F.2d 655, 658 (7th Cir.1986) (dicta).

We have no quarrel either with that general proposition or its applicability to new claims brought under the black lung benefits program. The key point is that the claimant cannot simply bring in new evidence that addresses his condition at the time of the earlier denial. His theory of recovery on the new claim must be consistent with the assumption that the original denial was correct. To prevail on the new claim, therefore, the miner must show that something capable of making a difference has changed since the record closed on the first application. As we said in *Sahara Coal*, if the earlier denial was premised on a failure to show pneumoconiosis, the material change could be evidence showing that the disease has now manifested itself. If the earlier denial was premised on a failure to show total disability, even if the claimant had a mild case of pneumoconiosis, then the material change would need to relate to the severity of the disability. See 946 F.2d at 558 ("[i]f having established that he is now totally disabled by black lung disease,

the claimant also establishes that his present condition is substantially worse than it was the first time he applied, that should be enough to establish his entitlement"). If the earlier denial listed both a failure to show pneumoconiosis and a failure to show total disability, the claimant can avoid automatic denial of his claim on res judicata grounds by showing a material change in either of those elements. That is the alternate ground situation that concerned the Fourth Circuit: because it is impossible to say which of these independently sufficient reasons for a denial was controlling, neither can be conclusive in future litigation. To win benefits on the merits, of course, the claimant would need to prove both (as well as the other criteria we have already noted).

The Director's "one-element" test comes close to what we have described here, as the following description from the Sixth Circuit's *Sharondale* decision shows:

> [T]he ALJ must consider all of the new evidence, favorable and unfavorable, and determine whether the miner has proven at least one of the elements of entitlement previously adjudicated against him. If the miner establishes the existence of that element, he has demonstrated, as a matter of law, a material change.

42 F.3d at 997–98. If by that the Director means that at least one element that might independently have supported a decision against the claimant has now been shown to be different (implying that the earlier denial was correct), then we would agree that the "one-element" test is the correct one. If the Director means something more expansive, his position would go beyond the principles of res judicata that are reflected in § 725.309(c) and that we endorsed in *Sahara Coal.* It is not for us to put words in his mouth; it is enough to say what we find the statute and regulations to require and for us to apply them to the Speses' case.

■ We have little trouble concluding, as the panel did, that the ALJ's decision that Mr. Spese demonstrated a material change in his condition was "rational, supported by substantial evidence, and in accordance with law." *Spese I,* 94 F.3d at 374, citing *Freeman United Coal Mining Co. v. Hunter,* 82 F.3d 764, 767 (7th Cir.1996), and *Old Ben Coal v. Director, OWCP,* 62 F.3d 1003, 1006 (7th Cir.1995). The three x-rays in the record were taken at different times (1976, 1982, and 1985). Each time, the x-ray in question was interpreted by an equally qualified reader. The 1976 and 1982 exposures were both interpreted as negative, which is consistent with the Board's denial of Mr. Spese's 1976 claim, but the 1985 exposure was positive. The ALJ found that the most recent of the three was entitled to the greatest weight, which was reasonable on this record. This is not a case like *Zeigler Coal Co. v. Lemon,* 23 F.3d 1235 (7th Cir.1994), on which Peabody relies, where conflicting interpretations of the most recent x-ray had to be weighed. *Id.* at 1237–38.

■ Peabody argued strenuously both in its briefs and during the two oral arguments in this case that the ALJ had no evidence before him that specifically addressed the question whether simple pneumoconiosis can be progressive without further exposure to coal dust. Both Mrs. Spese and the Director responded first that the progressive nature of the disease has been recognized as a legislative fact, but more importantly, that Peabody waived this argument by failing to make it to the ALJ. We agree with the waiver point and therefore find it unnecessary to address the extent to which the possibility of progression without further exposure can be, or has been, established as an incontrovertible fact. Once Mr. Spese introduced the 1985 x-ray, he had put before the ALJ concrete evidence that *his* simple pneumoconiosis had progressed. If Peabody wanted to controvert this evidence, either by submitting a competing interpretation of the 1985 x-ray or by introducing evidence that the disease of simple pneumoconiosis does not progress in that way in the human body, it was up to Peabody to do so. As the Director points out, Peabody's failure to do so means that the record does not even contain evidence on this point.

■ The consequences of Peabody's failure to mount any challenge to the ALJ's and the BRB's conclusion that the disease can progress are particularly apparent in light of the parties' efforts to force us to resolve this issue. In a supplemental appendix in this court, the Director offers various studies that

would support a finding that the disease can progress; Peabody responds with a Surgeon General's report that allegedly finds the contrary is true. In the end, the question whether simple pneumoconiosis can progress in the absence of further exposure to coal dust is a question of legislative fact. See generally *Menora v. Illinois High School Ass'n*, 683 F.2d 1030, 1036 (7th Cir.1982) (legislative facts are "general considerations that move a lawmaking or rulemaking body to adopt a rule"). It is not the sort of thing that should vary from case to case, even though there will always be a question whether a particular miner in fact contracted the disease and became totally disabled by it. The Director has stated here that he has "long believed in the progressivity of pneumoconiosis," and that this position is inherent in the duplicate claims regulation itself, 20 C.F.R. § 725.309. This may be true, but more importantly, the Benefits Review Board specifically found that "it has long been held that pneumoconiosis is a progressive and irreversible disease." *An[n]abelle Spese*, BRB Nos. 90–1856 BLA, 90–1856 BLA–A, slip op. at n. 6 (Dep't Labor Jan. 24, 1995). It rejected both Peabody's argument to the contrary and the probative value of the Surgeon General's report on which Peabody relied. Although in a proper case we see no reason why a company could not seek reconsideration of this (legislative) position, Peabody's failure to create a proper record before the ALJ makes it impossible for us to find error in the agency's refusal to do so here. Without such a record, we are left with Mr. Spese's evidence of the delayed appearance of the disease and the agency's acceptance of the general theory of progressivity, which was enough.

We also find no error in the ALJ's conclusion that Mr. Spese was totally disabled, as that term is used in the regulations. Once the evidence showed that he was totally disabled and that he was suffering from pneumoconiosis, the ALJ was entitled to invoke the presumption of total disability due to the pneumoconiosis established in 20 C.F.R. § 718.204(b). Last, § 718.305(a) sets up a rebuttable presumption of totally disabling pneumoconiosis when a miner was employed for 15 or more years in underground coal mines or substantially similar dust conditions and the claimant presents evidence of a totally disabling respiratory or pulmonary ailment. The ALJ found that Mr. Spese met these criteria and that Peabody had not rebutted his case. To the contrary, the medical testimony showed that Mr. Spese's respiratory problems (even before the positive x-ray) arose out of his coal mine work. Coupled with his more than 40 years' work at the surface mine, in conditions so dusty that he sometimes could not see what was in front of him, this was enough to support the ALJ's finding. If Peabody wanted to object to the ALJ's use of 20 C.F.R. § 725.503(b) to determine that benefits were payable beginning in the month of Mr. Spese's December 18, 1981 claim, it again had some responsibility to raise an objection before the ALJ. Since Peabody does not argue in the alternative that the ALJ erred in determining the date from which benefits accrued, that issue is waived.

We conclude, therefore, that Mrs. Spese is entitled to black lung benefits, as the surviving spouse of Mr. Spese, payable from December 1, 1981. We reject Mrs. Spese's argument that the 1981 claim merged with the 1976 claim, just as we reject Peabody's various challenges to the BRB's decision. The decision of the Benefits Review Board of the U.S. Department of Labor is AFFIRMED in its entirety. Costs to be taxed against Peabody.